## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, John R. Dunn, being sworn, state:

### Introduction and Agent Background

1. I am a Task Force Officer ("TFO") of the U.S. Drug Enforcement Administration (the "DEA") and have been so employed since January 2022. I am also a Trooper with the Massachusetts State Police ("MSP") and have been so employed since 2017. My current assignment with the DEA is with the Boston Tactical Diversion Squad ("TDS").

2. I have participated in investigations relating to the distribution of controlled substances, including fentanyl, methamphetamine, cocaine, and other substances in violation of the federal drug laws, including Title 21, United States Code, Sections 846 and 841(a)(1), and the drug laws of Massachusetts. I have received training in the field of narcotics enforcement and investigations. I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

3. Through my training, education, and experience, I have become familiar with the way illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs. I am familiar with the common appearance, packaging, texture, and smell of narcotics including fentanyl, methamphetamine, and other illegal drugs. I have debriefed defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operations of narcotics trafficking organizations.

4. Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity. I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers. I understand illegal drug trafficking often involves

the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors and money launderers.

5. Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones. Through my training and experience, I have acquired specialized knowledge in the activities of drug traffickers, including their use of residences, businesses, and drug "stash houses," to store and process drugs for distribution and to direct their drug distribution activities. That training and experience has led me to believe that drug traffickers store contraband, as well as other evidence of their crimes such as drug proceeds, cellular telephones, cuff sheets or owe sheets, at their residences, businesses, and stash houses.

## Purpose of Affidavit

6. I submit this affidavit in support of a criminal complaint against Randy RECINOS charging that, (1) on or about September 25, 2024, in North Andover, RECINOS distributed and possessed with intent to distribute a mixture and substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and (2) on or about October 28, 2024, in Lawrence, RECINOS distributed and possessed with intent to distribute 50 grams or more of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii) (the "Target Offenses").

## Probable Cause

7. In July 2024, a cooperating source (the "CS") provided information about Randy RECINOS, a drug trafficker in and around Lawrence, Massachusetts, who sells counterfeit Adderall pills containing methamphetamine and counterfeit pills containing fentanyl among other

illegal narcotics.  The CS previously bought drugs from RECINOS.  The CS provided xxx-xxx-7369 (the "7369 Phone")[1] as RECINOS's telephone number.  According to records from T-Mobile USA, Inc., the 7369 Phone is subscribed to "Randy R. Recinos," at an address in Lawrence, Massachusetts.[2]

*July 2024 - July 2025: The CS Bought Counterfeit Pills Ten Times from RECINOS*

8. Investigators directed the CS to contact RECINOS to buy counterfeit pills from RECINOS.  Between July 2024 and July 2025, law enforcement used the CS to conduct ten controlled purchases of counterfeit pills from RECINOS.  For each of the ten controlled purchases, the CS contacted RECINOS on the 7369 Phone subscribed to him and met with RECINOS in person to receive the drugs.  Investigators searched the CS before and after each controlled purchase for contraband and currency with negative results and surveilled the CS to and from the controlled purchases.  Additionally, prior to each controlled purchase, investigators equipped the CS with an audio or audio/video recording device.  In these controlled purchases, RECINOS typically came from his known place of employment, a manufacturing facility in Lawrence, to the controlled buys.  RECINOS typically drove to the buys using a Honda Accord (Mass. Reg. 3YEM63) registered to RECINOS, or a rental car rented to RECINOS.

9. For the first three controlled purchases, RECINOS provided the CS with pills that subsequent laboratory analysis showed contained no controlled substances.  After the CS complained about the quality of the pills, RECINOS began providing pills that contained

---

[1] The CS provided the entire phone number; I am withholding six digits of the phone number for privacy.
[2] The CS has a prior motor vehicle offense that was later dismissed.  In addition, the CS has a prior arrest for a drug-related offense for which s/he has not yet been charged.  The CS is cooperating with the hope of receiving charging consideration. The CS otherwise lacks any criminal history.  The CS provided information in this investigation that law enforcement corroborated.  The CS's information has led to the seizure of narcotics.  Based on the CS's work in this investigation, I believe the CS's information is reliable.

methamphetamine (six controlled purchases) and fentanyl (one controlled purchase). Laboratory analysis of pills from one of the ten controlled buys, involving pills suspected to contain fentanyl, remains pending. RECINOS also provided the CS with cocaine (one controlled buy).

10. In total, investigators used the CS to buy from RECINOS at least 1 kilogram of pills containing methamphetamine, at least 100 grams of pills containing fentanyl, and 3.5 grams of cocaine.

*September 25, 2024: RECINOS Distributed 49 Counterfeit Pills Containing Methamphetamine to the CS*

11. On September 25, 2024, investigators directed the CS to contact RECINOS on the 7369 Phone to buy pills. The CS did so and, in preserved text messages, the two arranged a time and location to meet. RECINOS and the CS also had unrecorded voice calls in which the CS told RECINOS he wanted a free sample of pills that were good quality. The buy on September 25 was the fourth controlled buy from RECINOS; laboratory analysis of the previous buys found that the pills RECINOS provided contained no controlled substance. RECINOS agreed to provide 30-50 pills from a "third source" that would be good quality. In preserved text messages, RECINOS said he was going to Chase Bank, 200 Turnpike Street, North Andover, and offered to meet there. The CS agreed.

12. At approximately 12:00 p.m., investigators established surveillance at RECINOS's workplace, a manufacturing facility in Lawrence that RECINOS came from prior to previous controlled buys. There, investigators located a gray Honda Accord (Mass. reg. 3YEM63), registered to RECINOS, that RECINOS used for prior controlled buys (the "Honda"). At approximately 3:22 p.m., investigators saw RECINOS exit the facility and enter the Honda. Investigators followed the Honda directly to the Chase Bank.

13.     Prior to the controlled buy, investigators searched the CS and the CS's vehicle for contraband with negative results. Investigators equipped the CS with a covert audio/video recording device. Investigators directed the CS to drive to the Chase Bank to meet with RECINOS. Investigators surveilled the CS as he drove to the Chase Bank.

14.     At about 4:53 p.m., the CS arrived at the Chase Bank and pulled alongside the Honda. An investigator saw RECINOS exit the Honda and enter the CS's car. The covert audio/visual recording device captured RECINOS inside the CS's car, handing a bag of orange pills to the CS:





5

15. RECINOS was in the CS's car for approximately five minutes. After RECINOS left, investigators surveilled the CS back to a neutral location where the CS provided investigators with the bag of pills received from RECINOS. Investigators searched the CS for contraband with negative results and retrieved the audio/video recording equipment.

16. The pills were later tested at a DEA laboratory and found to be 49 pills containing methamphetamine (3.2% pure) and weighing 14.578 grams.

*October 28, 2024: RECINOS Sold 1,018 Pills Containing Methamphetamine to the CS*

17. On October 27, 2024, investigators directed the CS to contact RECINOS on the 7369 Phone to buy approximately 1,000 counterfeit Adderall pills. In preserved text messages, the CS wrote, "Yoo need 1k tomorrow," meaning 1,000 pills. RECINOS responded, "Ok." The two arranged to meet the following day at a parking lot near 8 Beacon Street in Lawrence, Massachusetts, where most controlled buys from RECINOS occurred during the investigation. The two arranged to meet after RECINOS got off work.

18. At approximately 1:30 p.m., investigators established surveillance at RECINOS's workplace. There, investigators located a rented 2024 Ford Escape (Ala. reg. A0B17RW) (the "Ford") in RECINOS's usual parking spot. According to records from Enterprise Rent-A-Car, the Ford was rented to RECINOS. At approximately 3:33 p.m., an investigator saw RECINOS exit the facility and enter the Ford. Investigators followed the Ford directly to 8 Beacon Street.

19. Prior to the controlled buy, investigators searched the CS and the CS's vehicle for contraband with negative results. Investigators equipped the CS with a covert audio/video recording device. Based on a price of approximately $0.85 per pill, which RECINOS charged in prior controlled buys, investigators gave the CS $850 official money to make the purchase.

Investigators directed the CS to drive to 8 Beacon Street to meet with RECINOS. Investigators surveilled the CS as he drove to 8 Beacon Street.

20. At approximately 3:50 p.m., the CS arrived at 8 Beacon Street and parked. An investigator saw RECINOS exit the Ford and enter the CS's car. The covert audio/visual recording device captured RECINOS inside the CS's car, handing a large plastic bag to the CS:



7



21. The CS handed RECINOS the money; RECINOS can be seen on the covert recording device holding it. RECINOS asked, "850?" The CS affirmed.

22. RECINOS explained that he was driving a rental car because he got into "another accident." Toward the end of the conversation, the CS negotiated a lower price for future pills. RECINOS stated, "the best I could do is 60 . . . I get it for 50. . . . That's for the 10. For the 5, I could do 65." Based on my training, experience, and knowledge of this investigation, I believe RECINOS said that if the CS bought 10,000 pills ("the 10"), RECINOS could provide them for $0.60 per pill ("the best I could do is 60"). I further believe RECINOS said that if the CS bought 5,000 pills ("the 5"), RECINOS could provide them for $0.65 cents per pill ("I could do 65"). I further believe that RECINOS stated he was buying the pills for $0.50 per pill ("I get it for 50").

*August 27, 2025: RECINOS Sold to the CS Approximately 5,000 Counterfeit Pills Suspected to Contain Fentanyl*

23. On August 24, 2025, investigators directed the CS to contact RECINOS on the 7369 Phone to arrange a controlled purchase of approximately 5,000 counterfeit pills. In preserved

text messages, the CS did so and asked RECINOS, "you got addys or only the blues?" RECINOS responded, "I got blues, and I could get A's but the numbers is way too high." The CS asked for a price for 5,000 "blues." RECINOS responded, ".75." The two ultimately agreed to meet on August 27, 2025, at a fast-food restaurant on Winthrop Avenue in Lawrence, Massachusetts.

24. Prior to the controlled buy, investigators searched the CS and the CS's vehicle for contraband with negative results. Investigators equipped the CS with a covert audio/video recording device. Investigators provided the CS with official money for the purchase, though investigators planned to arrest RECINOS without paying for the drugs. Investigators directed the CS to drive to the fast-food restaurant. Investigators surveilled the CS as s/he drove to the fast-food restaurant.

25. At approximately 5:35 p.m., RECINOS and the CS met in the parking lot outside the fast-food restaurant. Investigators saw RECINOS enter the CS's car. Inside the CS's car, RECINOS handed the CS a Fruit Loops box that contained plastic bags with approximately 5,000 blue pills inside. The blue pills had a similar appearance to blue pills RECINOS previously sold the CS that were found to contain fentanyl. Based on my training, experience, and knowledge of this investigation, including the price paid for the pills and their appearance, I believe the pills will be found to contain fentanyl.

26. Investigators approached the CS's car and placed RECINOS under arrest.

## Conclusion

27. Based on the information set forth above, I believe probable cause exists to conclude that (1) on or about September 25, 2024, in North Andover, RECINOS distributed and possessed with intent to distribute a mixture and substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and (2) on or about October 28, 2024, in Lawrence, RECINOS

9

distributed and possessed with intent to distribute 50 grams or more of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii).

_____
John R. Dunn
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me via telephone in accordance with Fed. R. Crim. P. 4.1 on this 28th day of August 2025.

_____
HONORABLE DONALD L. CABELL
CHIEF UNITED STATES MAGISTRATE JUDGE